Carney R. Shegerian, Esq., State Bar No. 150461
CShegerian@Shegerianlaw.com
Anthony Nguyen, Esq., State Bar No. 259154
ANguyen@Shegerianlaw.com
William Reed, Esq., State Bar No. 261931
WReed@Shegerianlaw.com
Matthew T. Hale, Esq, State Bar No. 303826
MHale@Shegerianlaw.com
**SHEGERIAN & ASSOCIATES, INC.**
11520 San Vicente Boulevard
Los Angeles, California 90049
Telephone Number:      (310) 860 0770
Facsimile Number:      (310) 860 0771

CAPTION CONTINUED ON NEXT PAGE

Attorneys for Plaintiffs:
JAMES RUFFULO and VALERIE YANKUS,
individually and on behalf of all others similarly
situated

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES RUFFULO and VALERIE YANKUS, individually and on behalf of all others similarly situated, | **CLASS / COLLECTIVE ACTION** |
| Plaintiff, | Case No.: |
| vs. | **PLAINTIFFS JAMES RUFFULO AND VALERIE YANKUS' COMPLAINT FOR DAMAGES FOR:** |
| FARMERS INSURANCE EXCHANGE, FARMERS GROUP INC., TRUCK INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, and DOES 1 through 10 inclusive, | **(1) FAILURE TO PAY OVERTIME WAGES;** |
| Defendants. | **(2) DISPARATE IMPACT DISCRIMINATION IN VIOLATION OF THE FEHA;** |
| | **(3) DISPARATE TREATMENT DISCRIMINATION IN VIOLATION OF THE FEHA;** |
| | **(4) FAILURE TO PREVENT DISCRIMINATION IN VIOLATION OF THE FEHA;** |
| | **DEMAND FOR JURY TRIAL** |

Jeffrey A. Klafter, Esq.*
JAK@klafterlesser.com
Seth R. Lesser, Esq.*
Seth@klafterlesser.com
Sarah Sears, Esq.*
Sarah.Sears@klafterlesser.com
**KLAFTER LESSER LLP**
Two International Drive, Suite 350
Rye Brook, NY 10573
Telephone Number:       (914) 934-9200
*Pro hac to be filed*

COMPLAINT FOR DAMAGES

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

RELEVANT JOB TITLES ...............................................................................2

JURISDICTION AND VENUE .........................................................................3

PARTIES ...........................................................................................................4

DEFENDANTS ..................................................................................................5

FACTS ...............................................................................................................8

FLSA COLLECTIVE ALLEGATIONS ...........................................................23

STATE CLASS ACTION ALLEGATIONS ......................................................26

FIRST CAUSE OF ACTION ............................................................................28

    VIOLATION OF FLSA, 29 U.S.C. § 201, et seq. FAILURE TO PAY
    OVERTIME WAGES (On Behalf of Plaintiffs and the FLSA Collective) .............28

SECOND CAUSE OF ACTION .......................................................................29

    (Disparate Impact) (Discrimination in Violation of the FEHA) (Violation of
    California Government Code § 12900, et seq.) (On Behalf of Plaintiffs and
    the FEHA Class) ...........................................................................................29

THIRD CAUSE OF ACTION ...........................................................................31

    (Disparate Treatment) (Discrimination in Violation of the FEHA) (Violation
    of California Government Code § 12900, et seq.) (On Behalf of Plaintiffs and
    the FEHA Class) ...........................................................................................31

FOURTH CAUSE OF ACTION .......................................................................32

    (Failure to Prevent Discrimination in Violation of the FEHA) (Violation of
    California Government Code § 12900, et seq.) (On Behalf of Plaintiffs and
    the FEHA Class) ...........................................................................................32

PRAYER FOR RELIEF .....................................................................................33

JURY DEMAND ................................................................................................34

COMPLAINT FOR DAMAGES

Plaintiffs James Ruffulo and Valerie Yankus, (hereinafter "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, hereby file this Complaint against Defendants FARMERS INSURANCE EXCHANGE, FARMERS GROUP INC., TRUCK INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, and DOES 1 through 10 inclusive, (collectively, with the Doe defendants referred to herein as "Defendants" or "Farmers"). The following allegations are based on personal knowledge as to Plaintiffs' own circumstances and conduct and are made on information and belief as to the acts of others:

## INTRODUCTION

1.      This is a civil action seeking recovery for Defendants' violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*. and the California Fair Employment and Housing Act ("FEHA"), codified at California Government Code §§12900 – 12996.

2.      Farmers sold Plaintiffs and the other members of the class and collective defined below,[1] a dream - own an agency, be your own boss, create "generational wealth" on your terms, and work as long as you like.

3.      But it was a lie. Farmers unilaterally labelled and categorized Plaintiffs, and the other class and collective members, as "independent contractors," despite controlling almost every aspect of their employment – from the number of hours they had to work each week to the color of the paint on their office walls.

4.      Because of this misclassification, Farmers did not pay overtime to Plaintiffs or the other members of the FLSA Collective as defined herein, despite creating such workflows, training requirements, and demands for productivity so as to require them, as Defendants well knew it would, routinely to work over 40 hours a week in order to do the job.

---

[1] The collective and the class are the FLSA Collective and the FEHA Class, as defined in paragraphs 96 and 111 respectively below and, they shall be referred to collectively herein as "the Collective and Class."

COMPLAINT FOR DAMAGES

5.     To add insult to injury, starting in or around 2017, Farmers instituted a policy and procedure—the Managing Underperforming Agents ("MUA") program—that was nothing more than a pretext to discard agents on the basis of age and to replace them with "new blood" -- in other words, with younger insurance agents who would work under new and cheaper contracts.  This policy ramped up in 2019 and 2020, affecting hundreds, if not thousands, of older agents. Pursuant to this program, Farmers sent letters that threatened agents over the age of forty with termination for failure to meet nebulous "business results" that were not part of, and had never been contained in, the agents' contracts.  When agents then failed to meet these nebulous standards, they received a second letter informing them of their termination.

6.     Thus, after Plaintiffs, and those similarly situated, followed all the minutiae of Farmers' requirements, expending time, energy, and money into building what was supposed to be their own businesses, Farmers suddenly pulled the rug out from under them, forcing them to start over late in their careers.

7.     Plaintiffs' action seeks actual, statutory, and/or liquidated damages, as available under the laws asserted herein, as a result of Defendants' unlawful policies and practices, as well as declaratory and other relief.

8.     The acts complained of herein occurred, occur and/or will occur, at least in part, within the relevant statutes of limitations for the Collective and Class, and have occurred, occur, and/or will occur through the time of trial for this matter, although this should not automatically be considered the statute of limitations for any cause of action herein.

## RELEVANT JOB TITLES

9.     For introductory and general information only (and not to be considered a proposed class or collective definition), the relevant individuals in this action are Defendants' "insurance agents" who were subjected to Defendants' policies and practices – including, but not limited to Defendants' Managing Underperforming Agents program – as described herein. Any differences in job activities between the different individuals

in these positions were and are legally immaterial to the issues presented by this action.

10.    An "insurance agent" is the one tasked with selling insurance products to individuals and/or entities on behalf of Defendants.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C § 216(b).

12.    As to the state law claims asserted herein, this Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) inasmuch as the amount in controversy is greater than $75,000, exclusive of interest and costs and at least one member of the state law class asserted herein is a citizen of a state different from one of the Defendants.

13.    This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) because those claims arise from a common set of operative facts and are so related to the claims within this Court's original jurisdiction that they form a part of the same case or controversy.

14.    This Court has personal jurisdiction over Defendants because Defendants conducted business in California, had systematic and continuous ties with California, had agents and representatives in this state, and Defendants have their principal places of business in California. Thus, Defendants have sufficient minimum contacts with or otherwise purposefully avail themselves of the markets in the State of California, or otherwise have sufficient contacts with this District to justify them being fairly brought into court in this District.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the obligations, liabilities, and breaches complained of herein arose or occurred in this District and Defendants have their principal places of business within this District.

16.    This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

///

///

COMPLAINT FOR DAMAGES

# PARTIES

<u>PLAINTIFF JAMES RUFFULO:</u>

17.    Plaintiff James Ruffulo is an individual over the age of eighteen (18) and is now and/or at all times mentioned in this Complaint was a citizen of the State of Illinois.

18.    Plaintiff James Ruffulo was employed by Defendants as an insurance agent from approximately 1985 to March 2020. At the time of his termination, Plaintiff primarily performed his employment in Hillside, Illinois. At all times relevant Ruffulo performed his job satisfactorily and in compliance with his contract with Defendants.

19.    After approximately 35 years of employment with excellent reviews and after winning multiple awards, in or about December 2019, Plaintiff Ruffulo received a letter pursuant to the MUA program stating that his performance had fallen and that if he did not improve within sixty days, he would be terminated. There were no guidelines given for what improvement would be acceptable.

20.    Although Plaintiff Ruffulo was able to improve his production numbers within these three months, in or about March 2020, Plaintiff Ruffulo was called into a brief meeting with a supervisor and told that Defendants were terminating him on three months written notice. He was informed that there was nothing that could be done, as the decision had come "from higher up." Pursuant to this, Plaintiff's termination was effective on or about March 2020.

21.    At the time of his termination by Defendants, Plaintiff Ruffulo was over 40 years of age.

22.    Attached hereto as Exhibit A is a Consent to Join executed by Plaintiff Ruffulo.

<u>PLAINTIFF VALERIE YANKUS:</u>

23.    Plaintiff Valerie Yankus is an individual over the age of eighteen (18) and is now and/or at all times mentioned in this Complaint was a citizen of the State of Connecticut.

///

COMPLAINT FOR DAMAGES

24.    Plaintiff Yankus was employed by Defendants as an insurance agent from approximately January 2015 to March 2020. At the time of her termination, Plaintiff primarily performed her employment in Southbury and Danbury, Connecticut. At all times relevant Yankus performed her job satisfactorily and in compliance with her contract with Defendants.

25.    After approximately 5 years of employment with Defendants during which she received excellent customer service feedback, Plaintiff Yankus received a letter in or about March 2020 informing her that she was being terminated pursuant to the MUA program and that someone from Defendants would reach out to her to inform her what she owed them. Plaintiff Yankus was completely blindsided. She never received any initial letter informing her of any issue. Pursuant to this, Plaintiff Yankus' termination was effective on or about March 2020.

26.    Prior to receiving the letter, Plaintiff Yankus had been actively working with Farmers to scout new locations for an office in or around Southington, Connecticut. However, Farmers repeatedly and unilaterally gave the office locations found by Plaintiff Yankus to other agents.

27.    At the time of her termination by Defendants, Plaintiff Yankus was over 40 years of age.

28.    Attached hereto as Exhibit B is a Consent to Join executed by Plaintiff Yankus.

## DEFENDANTS

29.    Defendants are a group of affiliated insurance companies that sell property, casualty, and life insurance.

30.    Defendant Farmers Insurance Exchange is a California corporation with both its headquarters and main administrative office located at 6301 Owensmouth Avenue, Woodland Hills, California.

///

///

COMPLAINT FOR DAMAGES

31.     Defendant Truck Insurance Exchange is a California corporation with both its headquarters and main administrative office located at 6301 Owensmouth Avenue, Woodland Hills, California.

32.     Defendant Fire Insurance Exchange is a California corporation with both its headquarters and main administrative office located at 6301 Owensmouth Avenue, Woodland Hills, California.

33.     Defendant Farmers Group, Inc. d/b/a Farmers Underwriters Association ("FGI") is a Nevada insurance holding company with its headquarters located at 6301 Owensmouth Avenue, Woodland Hills, California. Truck Underwriters Association and Fire Underwriters Association are wholly owned subsidiaries of FGI, which, in turn, is a wholly owned subsidiary of Zurich Insurance Group Ltd, a Swiss holding company.

34.     Farmers Insurance Exchange, Fire Insurance Exchange, and Truck Insurance Exchange primarily sell personal automobile, homeowners, business insurance, and personal lines specialty products.

35.     FGI controls the sales goals and objectives of Farmers Insurance Exchange, Fire Insurance Exchange, and Truck Insurance Exchange, and thus the sales goals and objectives of the Exchanges' agents. FGI also owns the Farmers brand name and logo used to market all of their insurance products.

36.     At all relevant times, Defendants have employed Plaintiffs and the members of the collective asserted herein within the meaning of the FLSA and the state laws asserted herein.

37.     Defendants are each covered employers within the meaning of the FLSA.

38.     Defendants employed individuals (including Plaintiffs and the members of the class and collective asserted herein) who were engaged in commerce or the production of goods for commerce.

39.     Defendants each had annual gross revenues in excess of $500,000 for all relevant periods herein.

40.     Defendants operate in concert and together in a common enterprise and through related activities, so that the actions of one may be imputed to the other, and/or they operate as joint employers within the meaning of the relevant laws asserted, and/or were otherwise legally responsible for the matters alleged in this Complaint and proximately caused Plaintiffs and the members of the collective and class asserted herein to be subject to the unlawful practices described in this Complaint.

41.     Defendants both directly and indirectly employed Plaintiffs, as defined in the Fair Employment and Housing Act ("FEHA") at Government Code section 12926(d). In addition, Defendants compelled, coerced, aided, and abetted the discrimination, which is prohibited under California Government Code section 12940(i).

42.     Collectively, Defendants have directed the work of Plaintiffs and the members of the FLSA Collective and have benefited from work performed that Defendants suffered or permitted from them.

43.     DOES 1 to 10, inclusive are now, and/or at all times mentioned in this Complaint were licensed to do business and/or actually doing business in California.

44.     Plaintiffs do not know the true names or capacities, whether individual, partner or corporate, of DOES 1 to 10, inclusive and for that reason, DOES 1 to 10 are sued under such fictitious names pursuant to California Code of Civil Procedure ("CCP") § 474.

45.     Plaintiffs are informed and believe, and on that basis allege, that each of the defendants sued under fictitious names is in some manner responsible for the wrongs and damages alleged below, in so acting was functioning as the agent, servant, partner, and employee of the co-defendants, and in taking the actions mentioned below was acting within the course and scope of his or her authority as such agent, servant, partner, and employee, with the permission and consent of the co-defendants.

46.     Plaintiffs will seek leave of court to amend this Complaint to allege such names and capacities as soon as they are ascertained.

///

# FACTS

## I. Farmers Directs Its Insurance Agents Through a Comprehensive, Uniform, and Corporate-Wide System of Policies and Procedures

### A. Agent Appointment Agreements

47.    Plaintiffs were insurance agents for Farmers for between 5 and 35 years, as set forth hereinabove. Plaintiffs performed their jobs competently at all relevant times.

48.    Defendants required Plaintiffs to sign a standardized form entitled Farmers Insurance Group of Companies Agent Appointment Agreement (the "Agreement"), the terms of which are drafted by Defendants and were, and remain, non-negotiable as a mandatory condition of employment for agents.

49.    The terms of the Agreement between each member of the Class and Farmers are the same in all material respects, and the Agreements for both Plaintiffs are representative of the Agreements between Farmers and each member of the Class and Collective.

### B. No prior experience is required to be a Farmers' agent.

50.    A person needs no specialized knowledge or expertise to be hired as an insurance agent for Defendants nor does a person have to know how to sell insurance, run an insurance agency, or service customers.

///
///
///
///
///
///
///
///
///
///

51.    Indeed, Defendants' website states that after meeting with a Farmers' recruiter, the potential recruit will go through a background check and can then take classes to obtain their insurance license.



52.    For example, Plaintiff Ruffulo worked in newspaper advertising sales before starting with Farmers as an insurance agent. He did not have any prior work experience in the insurance industry before Farmers taught him how to sell insurance and run a Farmers' agency.

53.    Because no prior experience is required to be an insurance agent for Defendants, Defendants require all new insurance agents to go through a mandatory unpaid training process. This training process can be months. Plaintiff Yankus spent 5 to 6 weeks in the initial unpaid training.

54.    This mandatory in-depth training includes instruction on all aspects of selling insurance and servicing customers, the Farmers' products, and how to run and grow a Farmers' insurance agency. This training is not only mandatory at the beginning but continues to be a requirement throughout the insurance agent's career.

55.     Defendants even reassure prospective customers on their website that "Farmers agents undergo a rigorous training program before they are able to sell their first policy."



C. **A Farmers agent is a career position that Farmers can terminate at-will.**

56.     Like any other employee, individuals must apply with Defendants for the position of an insurance agent. Defendants use District Managers to recruit new insurance agents and employ career recruiters whose full-time job is to recruit insurance agents for Defendants and staff for the Farmers' agencies.

57.     Defendants require every new agent to agree that they are an "independent contractor." Nevertheless, the Agreement places no limit on the duration of the relationship and a person can spend their entire career as an insurance agent working for Defendants.

58.     Defendants also retain the right to terminate insurance agents at-will and without cause, as demonstrated by the MUA program, which terminated thousands of agents, including Plaintiffs, for not meeting undefined standards that were not contained anywhere in the Agreement.

COMPLAINT FOR DAMAGES

### D.   A Farmers agent does not own his or her book of business.

59.    The principal asset of a Farmers agency—or any insurance agency— is its book of business, which includes the policies, list of names, expirations, and other customer information that both generates commission income and is used to make additional sales.

60.    Plaintiffs built up their books of business over years or decades by developing relationships in their communities. Accordingly, Plaintiffs' books of business consisted of members of their communities, friends, and family members. Plaintiff Yankus counted her own son among her clients.

61.    Generally, truly independent insurance agents (i.e., true independent contractors) actually own the rights to their book of business. If an insurer terminates a relationship with an independent insurance agent, the book of business stays with that insurance agent.

62.    Here, however, Defendants' insurance agents are not independent and have no real ownership rights in their book of business. Defendants own and control the books of business, and if Defendants terminate an insurance agent, that book of business stays with Defendants, although there may be some measure of recompense. In fact, the Agreement requires an insurance agent to agree that that book of business is Defendants' "confidential property" that the agent will not retain following termination of the Agreement, despite the fact that insurance agents spend years cultivating relationships to build those books of business.

63.    Defendants also require insurance agents to sign a non-compete agreement that bars the agent from directly or indirectly soliciting, accepting, or servicing the insurance business of any policyholder of record in insurance agent's district for one year after termination. Accordingly, Plaintiffs are prohibited from selling insurance to their long-term clients, including to their own families - even if the clients wish to continue their relationships with Plaintiffs.

///

64.     Farmers insurance agents also have no rights to any other interests obtained incidental to the agency, including the telephone numbers and office space, as Defendants retain the right to require the insurance agents to assign all these interests to the Defendants upon termination.

65.     Further unlike independent agents who own and operate their own agencies, a Farmers insurance agent cannot freely sell his or her agency. Although Defendants claim that an insurance agent may sell the agency to immediate family members, Defendants reserve the right to control all aspects of any transaction related to the sale of the agency and can block the sale or any reason or no reason at all.

66.     Instead, when Defendants terminate an insurance agent, they usually leave the former agent only with the debt associated with the Farmers' agency he or she worked in, such as obligations to pay rent or any loans taken out to run a Farmers' agency that they no longer work in.

**E.   Defendants have the right to unilaterally reduce the insurance agents' pay.**

67.     In general, Defendants pay their insurance agents by commission. These commissions are not always based on policies sold by the agent, however, since Defendants can assign policies sold by one Farmers' insurance agent to another Farmers' insurance agent. For example, when Defendants terminate an agent, if Defendants decide to not service those policies in-house, they can assign those policies to another Farmers' insurance agent.

68.     Defendants also retain the right to reduce the commissions paid to its insurance agents for any reason, or no reason at all, and Farmers' insurance agents have no option but to accept Defendants' unilateral reduction in commissions.

69.     Moreover, Farmers unilaterally deducts funds for advertising from the commissions payable to Plaintiffs, even over Plaintiffs' objections. Plaintiff Yankus asked whether she could forego the deduction for advertising but was told that it was mandatory. As a result of these mandatory advertising deductions, Plaintiff Yankus struggled to

achieve any commission payments.

70. Because Defendants own the Farmers agencies, Defendants also provide insurance agents with subsidies (i.e., loans) to start-up the Farmers agencies. Plaintiff Yankus was compelled to repay a significant portion of the loan after being terminated.

**F. Defendants provide their insurance agents with employee benefits.**

71. Defendants provide their insurance agents a tax-deferred plan that allows any full-time agent who has completed six months of service to defer up to 50% of their new automobile policy commissions into a deferred compensation program.

72. Defendants also provide insurance agents with a group health plan.

**G. Defendants' insurance agents are cogs in the Farmers machine.**

73. Far from each agent running truly "independent" businesses, Farmers' insurance agents are simply a part of Defendants' sales force and are effectively nothing more than employees that Defendants refer to as independent contractors. But they are not— for all intents and purposes and in actual practice, Farmers' insurance agents are employees who sell policies and service policyholders "credited" to their account in order to meet Farmers' sale expectations and quotas.

74. Defendants have established a hierarchy of managers whose full-time job is to supervise the Farmers' insurance agents, including their sales activities, in order to meet Defendants' sales goals. Every sale is meticulously tracked. Each insurance agent reports to a District Manager, who reports to another Farmers' manager, all of whom are part of a hierarchy of Defendants' managers who ultimately report to an officer of Farmers Group, Inc.

75. In fact, Defendants compensate their District Managers based on the production of the agents in their district and can terminate District Managers for failing to meet the production goals set by Defendants, thereby incentivizing District Managers to supervise and control the insurance agents in their district.

///

///

COMPLAINT FOR DAMAGES

76.    Defendants' integrated sales force dedicated to supervising the insurance agents either exercises control over, or has the right to exercise control over, any aspect of how Defendants' insurance agent sells insurance, run the agencies, and service Defendants' customers. For example:

a.  Insurance agents cannot work from a home office. Defendants require the insurance agents to work in a Farmers' office or lease and/or purchase office space for the Farmers' agency.

b.  This requirement is non-negotiable. Plaintiff Yankus closed her agency office in Southbury, Connecticut and was seeking permission from Farmers to open an office closer to her home. During that time, she was forced by Farmers to drive an hour each way to work out of the Farmers Connecticut Territory Sales Office in Danbury, Connecticut several times a week.

c.  Defendants have the right to approve the location of the Farmers' agency and where agents share an office, and Defendants control with whom they can share an office. In fact, Defendants have the unilateral right to give away office locations that are found by insurance agents. Plaintiff Yankus scouted numerous office locations following her departure from her Southbury, Connecticut office, and each time Farmers approved a different insurance agent for the location. Plaintiff Yankus was unable to move and had to continue commuting to the office in Danbury, Connecticut.

d.  Defendants have the right to control the hours that the Farmers' agency is open for business. For example, Defendants currently require insurance agents to have the Farmers' agencies open for no less than 45 hours each week. This policy was not only mandatory but aggressively enforced. Farmers would routinely perform drop-in checks on insurance agents' offices, and if the office were not open or otherwise available to see clients, however brief the window of time, there would be repercussions.  Plaintiffs Ruffulo and Yankus both experienced these check-ins.

e.  Defendants have the right to control the appearance of the agency, both its inside and its exterior, in order to ensure the Farmers' brand is prominently displayed and the appearance meets Farmers' expectations of "professional appearance."

f.  Defendants maintain a standardized agency website for each insurance agent on the Farmers' website.

g.  Defendants required insurance agents to continue with mandatory training quarterly. Plaintiff Yankus found the requirements so onerous that she would often complete the training in the evenings at home, after the required office hours. In conversations concerning her production, Plaintiff Yankus informed her District Manager that she was working after hours to complete the trainings. Plaintiff Ruffulo also worked evenings or on the weekend in order to complete work that needed to be done.

h.  Defendants require agents to attend meetings with their managers to discuss their agencies' Agency Progress Review, during which time the agents' performance is evaluated and controlled. Defendants used a Secret Shopper program, requiring agents to meet with their managers "to discuss the findings."

77.  Defendants also limit the insurance agents' abilities to offer products to clients. Thus, for example, if an insurance agent cannot sell a potential customer a Farmers' product because the quote is too high, the insurance agent cannot freely offer the customer other options from different insurance companies.

78.  By contrast, independent insurance agents contract with multiple insurers to sell policies, they own and run their own insurance agencies, and they can offer their customers different options from different insurance companies.

79.  Defendants also monitor the insurance agents' sales activities, not just production. For example, Defendants can monitor an agents' quoting activity, cross sales, or the number of personal insurance reviews done by each insurance agent, which it calls

Farmers Friendly Reviews. Insurance agents were required to engage in this Farmers Friendly Reviews, which was nothing more than a Farmers' sales technique in which the insurance agent reviews a customer's personal situation to try and identify additional sales opportunities or upsells. Defendants even advertise "Farmers Friendly Reviews" on their website and encourage customers to contact one of their insurance agents to request a review.

80.    Farmers also requires compliance with their Agency Growth Model in order to qualify for yearend bonuses. Thus, Farmers routinely provides statistics for each agency, key performance indicators, and financial growth, comparing the agencies' actual performance to the targets assigned by Farmers. Agencies are then given a letter grade.

**H.   Smart Office Program**

81.    Defendants use the "Smart Office" program to further micromanage agencies. Under the Smart Office program, Defendants' managers evaluate the Farmers' insurance agents based on the number of office staff per policies in force, the size of the office, and the office appearance. The Smart Office standards are not mere good practice guidelines but are mandatory rules that must be followed. Insurance agents whom Defendants deem to not be "Smart Office compliant" can be reprimanded or threatened with termination.

82.    The "Smart Office" standards are also one of the eligibility requirements for Farmers awards and recognition programs, including the Topper Club, Championship, and Presidents Council.

///
///
///
///
///
///
///

83.    The Farmers' six Smart Office standards as set forth in the Farmers' handbooks are as follows:

## SMART OFFICE STANDARD #1

**Office should be open during normal business hours Monday through Friday, and at least 45 hours per week.**

Why: Consumers place a great emphasis on customer service and being able to talk to someone when they need their questions answered.

- Office should be open Monday - Friday.
- Office should be open for a minimum of 45 hours per week.
- Office should be open except for holidays observed by Farmers.
- Normal business hours are 8:30 AM to 5:30 PM.
- Consider staggered lunch hours to accommodate customer calls.
- A licensed and appointed representative should be available in the office during all normal business hours.

For Plaintiff Yankus this requirement meant that she was in the office 45 hours a week. She could not afford any staff and therefore had to make herself available during all required office hours because Defendants routinely checked to ensure that its insurance agents were Smart Office compliant. Both Plaintiff Ruffulo and Yankus routinely worked beyond 40 hours because of work that needed to be done.

///
///
///
///
///
///
///
///
///
///
///

COMPLAINT FOR DAMAGES

## SMART OFFICE STANDARD #2

**All agency staff who sell, solicit and /or negotiate insurance are licensed and appointed with Farmers.**

Why: Clients and potential clients appreciate having a knowledgeable and capable person, who can fulfill all of their requests including quoting and making policy changes.

- All agency staff members should be licensed in Property/Casualty and Life/Health with the state Department of Insurance.

- There are many vendors who provide online training for insurance licensing exams such as ExamFX and TesTeachers. The cost of training materials varies by vendor and state. Contact your District Manager for additional information on the licensing process for your state.

- All licensed staff members should also be appointed by Farmers Insurance Group so they can sell Farmers products.

- As part of the application process, the staff member will go through a background check (BIG) which requires a fee. The background check looks for any regulatory or criminal activity (if you believe a staff member may not qualify, the application can be completed prior to licensing).

- Once the background check is complete, the file is reviewed and approved by the territory office.

## SMART OFFICE STANDARD #3

**Agency communicates with the customer in a professional manner, including voicemail that states "Farmers Insurance" and refers customers to an appropriate customer service center outside of normal business hours and a 24-hour claims service center.**

Why: It is important for customers to have the ability to leave a message or speak directly with a Farmers trained professional after normal business hours.

- The agency voicemail should include a reference to Farmers Insurance and the Agency name.

- The agency should refer customers to two numbers on their voicemail system so that customer needs are met even when the agency is closed:

  - Refer the caller to the 24-hour Claims Center number (800-435-7764).

  - Refer the caller to the After Hour Customer Service number (877-327-6394).

- In addition to a professional voicemail message, the agency may want to add Farmers branded messaging for customers who are on hold:

  - Captive Audience, a Farmers approved vendor, can provide this type of support.

-18-

COMPLAINT FOR DAMAGES

**SMART OFFICE STANDARD #4**

**Agency maintains a professional office environment including appearance, equipment and furniture that is suitable for providing excellent customer service.**

Why: Your office is the first impression a client has of your Agency and can have a powerful impact, both positive and negative.

- Professional office furniture helps establish an environment of trust and gives customers confidence in choosing your agency for their insurance needs.
- OstermanCron offers four office packages (Basic, Good, Better, Best) to meet every budget.

This standard required insurance agents to pay out of pocket for all Farmers approved office furniture and décor. Farmers even required a particular shade of paint for the walls.

**SMART OFFICE STANDARD #5**

**Outdoor Signage: Agency maintains an outdoor Farmers sign that contains the Farmers logo consistent with the Trademark and Logo Guidelines.**

**Window Signage: To the extent an outdoor Farmers sign is precluded by lease or ordinance, agency maintains a window Farmers sign that contains the Farmers logo consistent with the Trademark and Logo Guidelines.**

Why: One of the most powerful assets you have working for you as a Farmers exclusive agency owner is the strength of the nationally recognized Farmers brand. Proudly displaying the logo helps identify you as a Farmers agent and will help draw people to your agency.

- Every agency should have at least one sign that is visible from the street or exterior of the building.
- If an outdoor sign is precluded by lease or ordinance, window decals are another way to display the logo to those passing by your office.
- For window decals, only white vinyl is to be used. If an office does not have any other exterior signs the emblem portion of the logo can be displayed in color (subject to approval).
- Exterior signs should follow Farmers Trademark and Logo Guidelines. Approval must be obtained for exterior signs prior to production, unless the signs are being ordered through the Agency Marketing Store. Approval can be obtained through the Agency Marketing site, under the Administration > Pre Approvals tab.
- Exceptions to the guidelines can be made, with approval, when architectural restrictions exist.
- Farmers has two full service sign vendors who will do everything for you - conduct a site inspection, obtain permits, produce a compliant sign and install it.

COMPLAINT FOR DAMAGES

This standard required insurance agents to pay out of pocket for all required signage, which did not include the expense of taking signs down that did not meet with Farmers' approval.

## SMART OFFICE STANDARD #6

**Agency prominently displays the Farmers brand a minimum of five times within the office and all Farmers branded material utilizes the Farmers logo consistent with the Trademark and Logo Guidelines.**

Why: Prominently displaying the Farmers logo inside your agency helps remind customers they are doing business with a Farmers agent.

- To help brand the interior of the office, it is recommended to have at least five visible Farmers logos. In addition to the logo, using our brand colors and displaying artwork that is representative of the Farmers brand are also helpful cues that reinforce our brand.

- Items that display the Farmers logo must follow the Farmers Trademark and Logo Guidelines. Approval must be obtained prior to production of these items unless purchased through the Agency Marketing Store. Approval can be obtained through the Agency Marketing site, under the Administration > Pre Approvals tab.

- Interior signs are available through the resources and vendors listed provided through the Smart Office site.

- Flat wall decals should not be used to display the logo. These are cheap representations of the logo and devalue the brand.

- Items such as shirts, coffee mugs, pens and pencils along with a myriad of other products that display the logo can also be used in your office. These can be ordered through the Agency Marketing Store.

- Artwork that showcases images consistent with Farmers branding is also available. Visit Fuerstap.com for great looking wall art!

This standard also forced insurance agents to pay out of pocket for branded items that are required in order to be compliant. Farmers also added to the requirements over time, incorporating things such as digital marketing standards. Farmers routinely reprimanded employees for failing to meet these requirements.

84. Farmers provided insurance agents with a never-ending number of exacting rules concerning these standards. For example, it published the following Smart Office Sign Vendor Information Guide:

///

///

As you prepare to become brand compliant before the December 31, 2016 deadline, you have several options to choose from when it comes to your office signage. The various options fall within three general categories; Turn Key – Full Service Custom Vendor, Turn Key – À La Carte Vendor and Local Vendors. The intent of this document is to provide you with a comprehensive comparison of all three options so that you can make a well informed decision to determine the option that is best for you. This guide provides a side-by-side comparison of the three sign categories, the pros and cons of each and some of the most frequently asked questions.

# VENDOR TYPES

**Turn Key – Full service custom vendor**
These sign vendors handle all aspects of the process – truly a turnkey experience. Farmers reimburses Agency Marketing participants $975 to cover the site inspection, code check (municipality/city requirements), brand book (recommended design and sign proposal) and initial project management fees. The reimbursement is processed on the same folio where charges appear. The time from inquiry to installation depends on permit requirements. If local government require permits the average time to completion is 15 weeks while no permit areas will require 12 weeks. These vendors also offer extended warranties on products and materials.

**Turn Key – À la carte vendor**
These options are available in the Agency Marketing Store and are already pre-approved reducing the potential for non-compliant signs. The agent/DM is responsible for several steps of the process including site survey, code check, permits and installation. Keep in mind, since there is no pre-approval use of the logo or installation, there is a possibility the signage could still be non-compliant if not properly installed. (There is no preapproval or claim to be submitted since the purchase is directly through the Agency Marketing Store). A la carte vendors are a great option when only a vinyl or interior sign is needed.

**Local vendor**
This is a labor intensive option and will require more time and involvement by the agent or District Manager. The agent/DM is responsible to manage the entire process, including submitting a preapproval and ensuring their vendor is producing brand compliant signage according to the Trademark and Logo Guidelines. There is the potential for delays with the manual preapproval process and claim reimbursement. Any issues that arise are the responsibility of the agent/DM to resolve.



# FAQ

**Q: What do I do if I ordered a sign and I find out it is not compliant?**
A: If a sign was ordered from a local vendor it is the agent's/DM's responsibility to ensure that it is compliant. You will need to work with your vendor to correct your sign or replace it to be compliant. Note: a preapproval is not a guarantee that a sign will be manufactured and/or installed properly. Placement, usage and materials used for the sign are also items for compliance that cannot be tracked through preapproval. If your sign is purchased from a full service custom sign vendor and you are being asked to replace the work that was completed, please contact Agency Marketing directly.

**Q: What are the repercussions if I ordered a sign from a vendor who did not file a licensing agreement with Farmers?**
A: The agent/DM is responsible to ensure the vendor they hire is properly licensed to use the Farmers logo and trademark. If the vendor installs a sign that is found to be non-compliant the agent/DM will be responsible for replacing the sign.

**Q: What are the repercussions if I ordered a sign from a vendor, with a licensing agreement but I did not get pre-approval from Agency Marketing?**
A: The agent/DM is responsible for getting a preapproval for all sign projects completed with local vendors. If the sign is not preapproved, the agent may not proceed with the vendor and may be required to have the design redone if the sign is not compliant.

**Q: Why does it take our full service custom vendors so long to produce a sign?**
A: During the extensive on-boarding process of our custom sign vendors it was determined that signage does take an average of 15 weeks to be done accurately according to Farmers brand standards. If you are experiencing customer service issues please let the Agency Marketing Sign Concierge know. They can be reached at (877) 812-2732 or email at signs@agentmarketingsupport.com. Please note, the Signs Concierge does not work for the full service custom sign vendor; they will document your concern and escalate for review.

## I. The MUA Program

## The Managing Underperforming Agents Program

85.    In 2017, Defendants implemented a Managing Underperforming Agents program, which was a performance management process put into place to cull or otherwise winnow insurance agents over the age of forty from Defendants' insurance agent workforce. Upon information and belief, this program was nationwide.

///

COMPLAINT FOR DAMAGES

86.     As set forth hereinabove, Farmers terminated Plaintiffs in or about March 2020. Each termination was the direct result of Farmers' MUA program.

87.     The MUA program was conceived of, developed, and implemented in and/or directed from California by Defendants, primarily by Farmers Group Inc. Here, the corporate headquarters of Farmers is based in Los Angeles, California. On information and belief, the tortious conduct, i.e., the decision to enact the Managing Underperforming Agents Program, occurred in California. On information and belief, the agencies department - headed by Senior VP of Farmers Dan Lewis – formed and managed the MUA program. On information and belief, California employees of Farmers, John Lindemann and Tina Hernandez, were also a part of forming and managing the MUA program.

88.     Over 1,000 agents were affected nationally.

89.     Pursuant to the MUA program, Farmers notified insurance agents of their business results and told them to improve within sixty days or risk termination. The MUA program occurred in three waves between 2017 and 2020. It was the first time that insurance agents were informed that they would be assessed on the applied metrics, especially since those metrics were not contained with the Agreements. Agents with less than three years on the job were excluded.

90.     Under the MUA program, insurance agents are first sent a form letter claiming that their performance has declined. Some such letters provided a set amount of time (generally three months) for insurance agents to improve business results. The standards for what would constitute improved business results are not provided. Despite the grant of time to rectify any losses, insurance agents are then inevitably provided a termination notice approximately three months later. In every instance, Farmers deliberately withheld from the agents any information about what business results they would deem acceptable.

91.     Once an insurance agent received the first form letter, termination was all but inevitable. For example, Plaintiff Ruffulo did manage to improve his performance within the 60 days but was still terminated.

92.    In some cases, Farmers neglected to even send the initial warning letter. Plaintiff Yankus never received a letter and was blindsided after being informed by her District Manager that she was part of the MUA program, given that she did not feel that she was underperforming or that her performance had changed in any way. Before receiving the letter, Plaintiff Yankus was working with Farmers to find a new office location in or around Southington, Connecticut.

93.    Under the Agreement, terminated agents are entitled to have their terminations reviewed by a "termination review board." Both Plaintiff Yankus and Plaintiff Ruffulo were told that there was nothing further that could be done. Plaintiff Ruffulo was told that the decision had "come from higher up."

94.    Both Plaintiffs Ruffulo and Yankus felt – and in actuality were – pushed out due to their age. Even before his interaction with the MUA program, Plaintiff Ruffulo's District Manager asked him if he had considered retirement. Plaintiff Yankus had similar experiences. Both her manager and a sales manager made comments to her about her age, including comments concerning her age and whether her memory was affected by her age.

95.    Indeed, the Farmers' MUA program was nothing more than a pretextual method for discarding older agents. After he was terminated, Plaintiff Ruffulo's book of business was given to a younger agent. Though Plaintiff Yankus never discovered what happened to her book of business following her termination, the Southington, Connecticut office location that she scouted and attempted to have approved by Farmers before being pushed out was instead given to a younger agent who was just starting out with Farmers.

## FLSA COLLECTIVE ALLEGATIONS

96.    Plaintiffs bring this action pursuant to 29 U.S.C. § 216(b) of the FLSA on their own behalf and on behalf of:

> All current and former insurance agents (as that term is defined, supra) who worked outside of the state of California for any Defendant at any time from three years prior to the date of the filing of this Complaint through judgment.

(hereinafter referred to as the "FLSA Collective"). Plaintiffs reserve the right to amend this definition if necessary.

97.    Excluded from the proposed FLSA Collective are insurance agents or former insurance agents who were employed by Defendants in the state of California.

98.    Defendants are liable under the FLSA for, inter alia, failing to properly compensate Plaintiffs and other similarly situated insurance agents.

99.    Consistent with Defendants' policy and pattern or practice, Plaintiffs and the FLSA Collective members were not paid premium overtime compensation when they worked beyond 40 hours in a workweek.  Indeed, at all relevant times, Defendants classified all sales agents under its employ as independent contractors, and not employees, and failed to pay all such agents (the FLSA Collective members) any overtime wages for hours worked in excess of 40 per week.

100.    All of the work that Plaintiffs and the FLSA Collective members performed was assigned by Defendants, and/or Defendants were aware of all of the work that Plaintiffs and the FLSA Collective members performed.

101.    As part of its regular business practice, Defendants intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiffs and the FLSA Collective members. This policy and pattern or practice includes, but is not limited to:

    a. Misclassifying Plaintiffs and the FLSA Collective as independent contractors; and

    b. Willfully failing to pay its employees, including Plaintiffs and the FLSA Collective, premium overtime wages for all hours worked in excess of 40 hours per workweek.

102.    Defendants are aware or should have been aware that federal law required them to pay Plaintiffs and the FLSA Collective overtime premiums for all hours worked in excess of 40 per workweek.  By virtue of the nature of the work assigned by Defendants and is as otherwise herein alleged, Defendants had actual knowledge that Plaintiffs and

the FLSA Collective members regularly worked in excess of 40 hours a week.

103.  Defendants' willful violation of the FLSA is further demonstrated by the fact that throughout the Collective Action Periods and continuing to the present, Defendants failed to maintain accurate and sufficient time records for Plaintiffs or the FLSA Collective members. Defendants acted recklessly or in willful disregard of the FLSA instituting a policy and/or practice that did not allow Plaintiffs and the FLSA Collective members to record all hours worked.

104.  Due to the foregoing, Defendants' failure to pay overtime wages for work performed by Plaintiffs and the FLSA Collective members in excess of forty (40) hours per workweek was willful and has been widespread, repeated and consistent.

105.  A collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiffs under 29 U.S.C. § 216(b). The employees on behalf of whom Plaintiffs bring this collective action are similarly situated because (a) they have been or are employed in the same or similar positions; (b) they were or are performing the same or similar job duties; (c) they were or are subject to the same or similar unlawful practices, policy, or plan; and (d) their claims are based upon the same factual and legal theories.

106.  The employment relationships between Defendants and every proposed FLSA Collective member are the same and differ only by name and location.  The key issue – whether Defendants' classification and compensation practices and policies violate the FLSA - does not vary among the proposed FLSA Collective members.

107.  There are many similarly situated current and former insurance agents who were underpaid in violation of the FLSA who would benefit from the issuance of a court supervised notice of this lawsuit and the opportunity to join it.

108.  This notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

109.  Those similarly situated employees are known to Defendant, are readily identifiable, and can be located through Defendants' records.

110.    Plaintiffs estimates the proposed FLSA Collective, including both current and former employees over the relevant period will include several hundreds, if not thousands, of workers. The precise number of FLSA Collective members should be readily available from a review of Defendants' personnel and payroll records.

## STATE CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring this case as a class action pursuant to California Government Code § 12900, et seq., on their own behalf and on behalf of:

> All former insurance agents (as that term is defined, supra) who worked outside the state of California for any Defendant at any time from three years prior to the date of the filing of this Complaint through judgment who was subjected to Defendants' policies and practices regarding age discrimination, particularly under Defendants' Managing Underperforming Agents program, and who was discharged pursuant to the MUA program.

(hereinafter, the "FEHA Class").

112.    The persons in the FEHA Class are so numerous that joinder of them all is impracticable. The precise number of such persons are known to Defendants, are readily ascertainable, and can be easily determined from its records.

113.    The age of the members of the FEHA Class protected by the FEHA was a substantial motivating reason in Defendants' decision to terminate the employment/contract of the members of the FEHA Class, not to retain or otherwise employ the members of the FEHA Class in any position, and/or to take other adverse employment actions against the members of the FEHA Class.

114.    Defendants employed a predatory employment practice—the Managing Underperforming Agents program— whereby older members of Defendants' sales force (i.e., agents age 40 and over) were terminated, forced out, forced to sell their books of business, or otherwise pushed into retirement in favor of new hires, the majority of whom are believed to be under 40 years of age. Said employment practice was not job related or otherwise consistent with any legally justifiable business necessity.

115. This employment practice had a disproportionate adverse effect on employees age 40 and over (such as the FEHA Class) under numerous legally operative tests, including the 80% Rule (or 4/5ths Rule) set forth by the Uniform Guidelines of Employment Selection procedures as well as tests of statistical significance.

116. Defendants have acted or have refused to act on grounds generally applicable to the FEHA Class, thereby making appropriate final injunctive relief or declaratory relief with respect to the FEHA Class as a whole.

117. There are questions of law and fact common to the FEHA Class that predominate over any questions solely affecting individual members of the FEHA Class, including but not limited to:

   a. Whether Defendants' conduct constitutes age discrimination under a disparate impact theory in violation of California Government Code § 12940(a);

   b. Whether Defendants' conduct constitutes age discrimination under a disparate treatment theory in violation of California Government Code § 12940(a);

   c. Whether Defendants' conduct constitutes a failure to prevent discrimination in violation of California Government Code § 12940(k);

   d. Whether the members of the Class are entitled to compensatory damages, and if so, the means of measuring such damages;

   e. Whether the members of the Class are entitled to punitive damages as to Counts III and IV;

   f. Whether the members of the Class are entitled to injunctive relief;

   g. Whether Defendants are liable for attorneys' fees and costs; and

   h. the nature and extent of Class-wide injury.

118. The claims of Yankus and Ruffolo, as Plaintiffs and class representatives for the FEHA Class, are typical of the claims of the members of the class.

///

119.   Plaintiffs Yankus and Ruffolo as class representatives and the undersigned counsel will fairly and adequately protect the interests of the FEHA Class.

120.   Class adjudication of the FEHA Class is appropriate because prosecution of separate actions by class members could result in inconsistent adjudications; a substantial risk of each individual plaintiff presenting in separate, duplicative proceedings the same or essentially similar arguments and evidence, including expert testimony; a multiplicity of trials conducted at enormous expense to both the judicial system and the litigants; potentially incompatible standards of conduct for Defendants; and potentially incompatible legal determinations with respect to individual members of the Class which would, as a practical matter, be dispositive of the interest of the other members of the Class who are not parties to the adjudications or which would substantially impair or impede the ability of the members of the Class to protect their interests.

121.   Class adjudication is superior to all other methods to resolve the disputes for the FEHA Class over whether Defendants' MUA program constituted age discrimination and failure to prevent discrimination and is necessary in order to fairly and completely litigate the dispute.

**FIRST CAUSE OF ACTION**

**VIOLATION OF FLSA, 29 U.S.C. § 201, et seq.**

**FAILURE TO PAY OVERTIME WAGES**

**(On Behalf of Plaintiffs and the FLSA Collective)**

122.   Plaintiffs re-allege and incorporate paragraphs 1 through 110 by reference as if fully set forth herein.

123.   At all times relevant to this action, Defendants were engaged in interstate commerce, or in the production of goods for commerce, as defined by the FLSA.

124.   At all times relevant to this action, Plaintiffs were "employees" of Defendants within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA.

125.   At all times relevant to this action, Defendants "suffered or permitted" Plaintiffs and all similarly situated current and former employees to work and thus "employed" them within the meaning of 29 U.S.C. § 203(g) of the FLSA.

126.   Plaintiffs and the FLSA Collective members, by virtue of their job duties and activities actually performed, are all non-exempt employees.

127.   Plaintiffs' regular rate of pay was not in excess of one and one-half times the minimum hourly rate required by 29 U.S.C. § 206 of the FLSA.

128.   At all times relevant to this action, Defendants failed to pay Plaintiffs and the FLSA Collective federally mandated overtime compensation for work performed in excess of forty (40) hours in a workweek.

129.   In workweeks where Plaintiffs and other FLSA Collective members worked 40 hours or more, all overtime should have been paid at the federally mandated rate of 1.5 times each employee's regularly hourly wage. 29 U.S.C. § 207.

130.   Defendants' violations of the FLSA were knowing and willful. Defendants knew or could have tracked the hours worked by Plaintiffs, properly classified Plaintiffs as employees, and paid them overtime wages as required by the FLSA, but it did not.

131.   The FLSA provides that as a remedy for a violation of the Act, each employee is entitled to his or her unpaid wages (including unpaid overtime), plus an additional equal amount in liquidated damages (double damages), plus costs and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### (Disparate Impact)

### (Discrimination in Violation of the FEHA)

### (Violation of California Government Code § 12900, et seq.)

### (On Behalf of Plaintiffs and the FEHA Class)

132.   Plaintiffs re-allege and incorporate paragraphs 1 through 95 and 111 through 121 by reference as if fully set forth herein.

133.    As set forth above, Defendants' conduct, as alleged, violated the FEHA and Defendants committed unlawful employment practices, including the taking of adverse employment actions against the FEHA Class, including discharging, barring, refusing to retain, select, and/or employ, and/or otherwise discriminating against the FEHA Class, in whole or in part on the age of the members of the FEHA Class in violation of California Government Code § 12940(a) and similar laws and/or statutory age discrimination laws and implementing regulations in effect in other States.

134.    As a proximate result of Defendants' discrimination against the FEHA Class, the FEHA Class has sustained and continues to sustain substantial losses of earnings and other employment benefits.

135.    As a proximate result of Defendants' discrimination against the FEHA Class, the FEHA Class has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to the FEHA Class members' damage in a sum according to proof.

136.    That calculation of individual damages for the members of the FEHA Class may at some point be required does not foreclose the possibility of taking common evidence on questions regarding their entitlement to general and special damages.

137.    The FEHA Class has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to California Government Code § 12965(b), the FEHA Class is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

///
///
///
///
///
///
///

### THIRD CAUSE OF ACTION

### (Disparate Treatment)

### (Discrimination in Violation of the FEHA)

### (Violation of California Government Code § 12900, et seq.)

### (On Behalf of Plaintiffs and the FEHA Class)

138.   Plaintiffs re-allege and incorporate paragraphs 1 through 95 and 111 through 121 by reference as if fully set forth herein.

139.   As set forth above, Defendants' conduct, as alleged, violated the FEHA  and Defendants committed unlawful employment practices, including the taking of adverse employment actions against the FEHA Class, including discharging, barring, refusing to retain, select, and/or employ, and/or otherwise discriminating against the FEHA Class, in whole or in part on the age of the members of the FEHA Class in violation of California Government Code § 12940(a) and similar laws and/or statutory age discrimination laws and implementing regulations in effect in other States.

140.   As a proximate result of Defendants' willful, knowing, and intentional discrimination against the FEHA Class, the FEHA Class has sustained and continues to sustain substantial losses of earnings and other employment benefits.

141.   As a proximate result of Defendants' willful, knowing, and intentional discrimination against the FEHA Class, the members of the FEHA Class have suffered and continue to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to the FEHA Class members' damage in a sum according to proof.

142.   That calculation of individual damages for the members of the FEHA Class may at some point be required does not foreclose the possibility of taking common evidence on questions regarding their entitlement to general and special damages.

143.   The method of proof under this theory is expressly limited to:  (1) discriminatory decision-making at a high level that affected the FEHA Class as a whole, and/or (2) statistical data that also applies to the FEHA Class as a whole.

///

144.    The FEHA Class has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to California Government Code § 12965(b), the FEHA Class is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

145.    Defendants' discrimination was committed intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, and this entitles the FEHA Class to punitive damages against Defendants.

## FOURTH CAUSE OF ACTION

### (Failure to Prevent Discrimination in Violation of the FEHA)

### (Violation of California Government Code § 12900, et seq.)

### (On Behalf of Plaintiffs and the FEHA Class)

146.    Plaintiffs re-allege and incorporate paragraphs 1 through 95 and 111 through 121 by reference as if fully set forth herein.

147.    At all times herein mentioned, FEHA, California Government Code § 12940(k), was in full force and effect and was binding on Defendants. This statute states that it is an unlawful employment practice in California for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."

148.    During the course of the employment of the FEHA Class members, Defendants failed to prevent a pattern and practice intentional discrimination on the basis of age.

149.    The FEHA Class members believe, and on that basis allege, that their ages were substantial motivating factors in Defendants' discrimination against the members of the FEHA Class.

150.    As a proximate result of Defendants' willful, knowing, and intentional misconduct, the FEHA Class has sustained and continue to sustain substantial losses of earnings and other employment benefits.

///

151.   As a proximate result of Defendants' willful, knowing, and intentional misconduct, the FEHA Class has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to his damage in a sum according to proof.

152.   That calculation of individual damages for the members of the FEHA Class may at some point be required does not foreclose the possibility of taking common evidence on questions regarding their entitlement to general and special damages.

153.   The FEHA Class has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to California Government Code § 12965(b), the FEHA Class is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

154.   Defendants' misconduct was committed intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, entitling the FEHA Class to punitive damages against Defendants.

## PRAYER FOR RELIEF

**Wherefore,** Plaintiffs demand judgment and orders against defendants on behalf of themselves and the Class and Collective Members as follows:

1.      An order determining that the action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the claims asserted in Counts II through IV;

2.      An order determining that the action can proceed on a collective basis for the claims asserted in Count I;

3.      Awarding Plaintiffs and the Class and Collective Members actual, statutory, liquidated and all other damages permissible by law for the Claims asserted in this Complaint;

///

///

4.     Awarding Plaintiffs and the Class and Collective members their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert fees and other costs;

5.     Awarding Plaintiffs and the FEHA Class members punitive damages for Counts III and IV asserted in this Complaint;

6.     Granting such equitable and/or injunctive relief as permitted by law or equity for the Claims asserted in this Complaint;

7.     Granting declaratory and injunctive relief and all relief that flows from such declaratory and injunctive relief as permitted by law or equity for the Claims asserted in this Complaint; and

8.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs on their own behalf and on behalf of and all others similarly situated, hereby demand trial by jury.


Dated: March 9, 2023                    SHEGERIAN & ASSOCIATES, INC.


                                       By:  _____
                                            Carney R. Shegerian, Esq.
                                            Anthony Nguyen, Esq.
                                            William Reed, Esq.
                                            Mathew Hale, Esq.

                                            Attorneys for Plaintiffs
                                            JAMES RUFFULO and VALERIE
                                            YANKUS, on behalf of themselves and
                                            all others similarly situated

///

///

///

-34-

COMPLAINT FOR DAMAGES

1  Dated: March 9, 2023                    KLAFTER LESSER LLP

2

3                                   By:    /s/ Seth Lesser
                                          _____
4                                         Seth R. Lesser, Esq.
                                          Sarah Sears, Esq.
5
6                                         Attorneys for Plaintiffs
                                          JAMES RUFFULO and VALERIE
7                                         YANKUS, on behalf of themselves and
                                          all others similarly situated
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT FOR DAMAGES